## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALICE F., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 17 C 3710 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| HEALTH CARE SERVICE | ) | |
| CORPORATION d/b/a BLUE CROSS | ) | |
| BLUE SHIELD OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alice F. is a dependent on her father's employment-based health insurance plan, which is managed by Defendant Health Care Service Corporation ("HCSC"). Plaintiff has brought this lawsuit under the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that HCSC wrongly denied her coverage for mental health services in violation of 29 U.S.C. § 1132(a)(1)(B). Both sides have cross-moved for judgment under Federal Rule of Civil Procedure 52. For the reasons stated herein, the motions are granted in part and denied in part. Specifically, the Court enters judgment in Defendant's favor with respect to Plaintiff's stay at Second Nature Uintas ("Second Nature"), but in Plaintiff's favor with respect to her stay at Vista Residential Treatment Center ("Vista").

## Legal Standard

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits."

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). To that end, ERISA allows suits to recover benefits due under a plan, to enforce rights under the terms of a plan, and to obtain declaratory judgments of future entitlements to benefits under a plan. *Firestone Tire & Rubber Co.*, 489 U.S. at 108; 29 U.S.C. § 1132(a)(1)(B).

The Court's standard of review in such a suit depends on whether the plan administrator or fiduciary has been granted "discretion in making the benefit determination." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 989 (N.D. Ill. 2003) (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Here, the parties agree that *de novo* review—more accurately described as an independent decision by the Court concerning the scope of coverage—is appropriate under Plaintiff's ERISA plan. *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009).

In cases concerning the scope of coverage under an ERISA plan, a "trial on the papers" under Rule 52 is appropriate. *See Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 857 (N.D. Ill. 2015) (collecting cases). Where an action is "tried on the facts without a jury," Rule 52 requires the district court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012). In doing so, the district court must "explain the grounds" of its decision and provide a "reasoned, articulate adjudication." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

In a *de novo* determination of coverage, the Court may consider evidence submitted to the plan administrator as well as other evidence submitted by the

parties to the extent "necessary to enable [the Court] to make an informed and independent judgment." *Estate of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 402 (7th Cir. 2010); *see Krolnik*, 570 F.3d at 843–44. Accordingly, the Court has considered the documentary evidence offered by the parties, the weight to be given to the evidence, and the credibility of statements contained within that evidence. Furthermore, the Court has considered the memoranda and proposed findings of facts submitted by the parties and the legal and factual arguments set forth therein.

## Background Facts

Plaintiff is now 20 years old and was between 16 and 17 years old when she received the services at issue. Pl.'s SOF ¶¶ 1–2, ECF No. 46.[1] During the relevant time, Plaintiff's father was employed by Sandbox Holding, LLC, which offered the "Sandbox Holding, LLC Welfare Benefit Plan" ("the Plan"). *Id.* ¶ 2. Defendant was the Claims Administrator for the Plan. Def.'s Resp. Pl.'s SOF ¶ 4, ECF No. 55; Def.'s SOF ¶ 3, ECF No. 54.

Plaintiff began experiencing mental health problems, learning disabilities, and other behavioral issues in early adolescence. Pl.'s SOF ¶¶ 9, 11–12. By the summer of 2014, she began using illegal substances such as cannabis, psilocybin mushrooms, and methamphetamine. *Id.* ¶ 13. She was also the victim of sexual assault. *Id.*

---

[1]     Defendant objects to Plaintiff's citation to a document "outside the administrative record" that shows her date of birth. In a *de novo* determination of coverage, the Court may consider evidence submitted to the plan administrator as well as other evidence submitted by the parties to the extent "necessary to enable [the Court] to make an informed and independent judgment." *Estate of Blanco*, 606 F.3d at 402. The Court concludes that Plaintiff's date of birth and age during the events in question are "necessary to enable [the Court] to make" an informed judgment in this case. *Id.*

In October 2015, Dr. Jonathan Bloomberg, a child psychiatrist, noted that Plaintiff had "worked with a number of therapists and psychiatrists" and had been "treated pharmacologically for impulse control issues." R. 775.[2] Yet Plaintiff was still engaging in a "number of high risk behaviors," such as "stealing, lying, cult activities, shoplifting, . . . aggressive drug use . . . [and] high risk sexual behaviors." Pl.'s SOF ¶ 16. Because of these behaviors and her tendency to manipulate and conceal her dangerous activities, Dr. Bloomberg recommended to Plaintiff's parents that "she be immediately transferred to a Residential Setting so that she might address her dangerous lifestyle[.]" *Id.* Dr. Bloomberg opined that Plaintiff's "life was in danger and it was imperative that she be transferred to a long term Residential Setting away from home in order to save her life." *Id.*

Plaintiff was admitted to Second Nature, an outdoor therapy program in Duchesne, Utah, from February 18, 2015, to May 26, 2015. Pl.'s SOF ¶¶ 17–18. After leaving Second Nature, she stayed at Vista, a residential treatment center in Sandy, Utah, from May 26, 2015, to May 15, 2016. Pl.'s SOF ¶¶ 22, 25.

## Coverage for Treatment at Second Nature

Defendant denied coverage for Plaintiff's entire stay at Second Nature, finding that it was a "wilderness program" not covered by the Plan. *See* Def.'s SOF ¶ 51.

---

[2] Plaintiff and Defendant have each submitted appendices, found at ECF Nos. 48, 56, and 57. For the most part, these appendices contain documents from the record with a Bate stamp beginning "HCSC_Alice F_. . .". For ease of reference, the Court refers to these documents with the notation "R." and eliminates leading zeroes. Plaintiff's appendix contains supplemental documents with a Bate stamp beginning "Alice F._ . . .". The Court refers to these documents with the notation "R.A."

Plaintiff contests this finding and contends that her treatment at Second Nature was eligible for coverage under the Plan as a "residential treatment center." The Court enters the following findings of fact (which are essentially undisputed) and conclusions of law regarding the scope of the insurance contract.

## I. Findings of Fact

Second Nature is licensed by the state of Utah as an "Outdoor Youth Treatment" program. R. 878. Utah also offers licensure as a "Residential Treatment Program," which Second Nature has not obtained. Def.'s SOF ¶ 16–17. Second Nature's website describes it as "more than a wilderness program," and states that it offers weekly individual therapy sessions and group therapy sessions during field days. Pl.'s SOF ¶ 17; R.A. 436–37. Second Nature also makes medical and "support staff" available 24/7. Pl.'s SOF ¶ 17; R.A. 439.

Plaintiff submitted a claim for coverage under the Plan for the treatment she received at Second Nature from February 18, 2015, to May 26, 2015. Pl.'s SOF ¶ 28. The Plan provides that "[i]npatient benefits . . . will . . . be provided for the diagnosis and/or Treatment of Inpatient Mental Illness in a Residential Treatment Center." *Id.* ¶ 29. The Plan defines "Residential Treatment Center" as follows:

> [A] facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, structure and is licensed by the appropriate state and local authority to provide such service. It does not include half-way houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing

5

services for patients with Mental Illness and/or Substance Abuse disorders . . . .

*Id.* ¶ 30 (emphasis added).

On November 9, 2015, Defendant sent a letter to Plaintiff explaining that treatment at Second Nature was not covered under the Plan:

> Wilderness therapy is not a covered benefit for any of the BCBSIL health plans. The facility was contacted and staff there confirmed Second Nature Therapeutic is not licensed as [a] Residential Treatment Facility. The State of Utah also confirmed the facility is not registered as a licensed Residential Treatment facility (RTC). It is licensed as an Outdoor Youth Treatment Center.

Def.'s Resp. Pl.'s SOF ¶ 31.

Plaintiff appealed the denial of coverage, but Defendant stood by its decision.

Pl.'s SOF ¶¶ 32–35.

## II.    Conclusions of Law

Plaintiff contends that Second Nature qualifies as a "residential treatment center" ("RTC") as defined by the Plan, despite the Plan's exclusion for "wilderness programs." Plaintiff further contends that, to the extent Second Nature is excluded as a wilderness program, that exclusion violates the Mental Health Parity and Addiction Act of 2008 ("the Parity Act"), Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified at 29 U.S.C. § 1185a), as well as Illinois's corresponding statute providing for mental health and addiction parity, 215 Ill. Comp. Stat. 5/370c.1. Defendant in turn contends that Second Nature is a wilderness program properly excluded from

coverage under the Plan and disputes the notion that the exclusion violates the principles of mental health parity.[3]

### A.     Coverage of Second Nature as an RTC

Courts construe ERISA plans according to ordinary principles of contract interpretation. *US Airways, Inc. v. McCutcheon*, 569 U.S. 88, 102 (2013). Where a plan term is ambiguous, it is construed strictly in favor of the insured. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 311–13 (7th Cir. 1992); *see Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 665 (7th Cir. 2005).

The parties' dispute centers on the Plan's definition of "Residential Treatment Center."   Recall that, under the Plan, RTCs do not include "half-way houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long term social needs, even if counseling is provided in such facilities."  The parties disagree as to whether the adjective clause—"that provide primarily a supportive environment and address long term social needs"—only modifies "other facilities" or also modifies "wilderness programs."

---

[3]     The Court does not consider Plaintiff's argument that Defendant committed procedural errors under ERISA regulations when reviewing her claim, as the Court is reviewing Plaintiff's eligibility for coverage *de novo*.  *See Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (noting that the question in *de novo* review is not whether the plan administrator provided a full and fair hearing, but whether the plaintiff ultimately was eligible for the benefits sought under the plan).  Similarly, the Court will not address Defendant's invocation of Plaintiff's failure to obtain preauthorization, given that Defendant does not press this issue as a reason for denial.

Plaintiff urges the latter construction and argues that, as a result, wilderness programs are excluded from the definition of RTCs if and only if they "provide primarily a supportive environment and address long term social needs." As Plaintiff sees it, if a wilderness center provides other therapeutic services (as, she says, Second Nature did), it qualifies as an RTC. Pl.'s Mem. Supp. at 8, ECF No. 45.

Defendant in turn contends that Plaintiff's reading of the clause violates the "last antecedent rule," and that the phrase "provide primarily a supportive environment and address long term social needs" describes only the "other facilities" excluded under the Plan. Def.'s Mem. Supp. at 12, ECF No. 53.

Both parties are half right. The last antecedent rule provides that "[r]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent." *Shelby Cty. State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 836 (7th Cir. 2002). Accordingly, under a plain reading of the Plan's terms, "provide primarily a supportive environment and address long term social needs" modifies "other facilities," not "wilderness programs." But Defendant ignores other relevant principles of contract interpretation, such as the doctrines of *ejusdem generis* and *noscitur a sociis*.

*Ejusdem generis* refers to the principle that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (internal quotation marks and citation omitted). Relatedly, the doctrine of *noscitur a sociis* "raises the implication that the 'words grouped in a list should be

given related meaning.'" *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006) (internal quotation marks and citation omitted). Together, these rules "instruct that words in a series should be interpreted in relation to one another." *Ali*, 552 U.S. at 229 (Kennedy, J., dissenting). What is more, one cannot read the Plan's sentence in isolation, but must consider it in the context in which it appears; in this case, the general definition of what an RTC is, not only what it is not. *See Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 613 (7th Cir. 2011) (explaining that a "basic principle of contract interpretation" is that "contractual provisions are not to be read in isolation"); *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010) ("Contracts must be read as a whole, and the meaning of separate provisions should be considered in light of one another and the context of the entire agreement.").

Applying these principles here, although the phrase "provide primarily a supportive environment and address long term social needs" modifies "other facilities," the inclusion of such "other facilities" in a list along with "wilderness programs" must have some definitional significance. The obvious implication is that this list of facilities—half-way houses, supervised living, group homes, wilderness programs, boarding houses, *and* "other facilities"—all offer a distinct type of service (primarily a supportive environment addressing social needs) in contrast to the services provided by RTCs. RTCs, rather than providing mostly support and social services, offer a "defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, [and]

structure," as well as medical monitoring with 24-hour onsite nursing services. Pl.'s SOF ¶ 30. Here, just as in *Welp v. Cigna Health & Life Insurance Co.*, the citation to wilderness programs and "other facilities" merely serves as an "illustration of . . . treatment that does not meet" the limitations placed on RTCs. No. 17-80237-CIV, 2017 WL 3263138, at *5 (S.D. Fla. July 20, 2017).

Accordingly, the question in this case is whether Second Nature qualifies as an RTC, with all that entails under the Plan, or whether it is a "wilderness program," defined by the Plan as primarily offering support and social services. Plaintiff seems to agree that Second Nature *is* a wilderness program, but argues that it is one that has many of the qualities of an RTC under the Plan, such as round-the-clock care and therapeutic intervention, and is "not merely a so-called 'wilderness program'" that "provide[s] primarily a supportive environment and address[es] long term social needs." Pl.'s Mem. Supp. at 9.[4] Defendant responds that Second Nature is not licensed as a "Residential Treatment Program" in Utah, and therefore cannot qualify as an RTC because the Plan requires RTCs to be "licensed by the appropriate state and local authority to provide such service." *See* Pl.'s SOF ¶ 30.

Defendant's point is well-taken—Second Nature is licensed in Utah as an "Outdoor Youth Program," a licensing scheme with different requirements than those for "Residential Treatment Programs." *See* Utah Admin. Code r. 501-8 *et seq.*

---

[4]     Plaintiff also contends that Second Nature meets the definition of a "residential treatment center" as adopted by the American Academy of Child & Adolescent Psychiatry. Pl.'s Mem. Supp. at 8–9. This may be so, but the only question here is whether Second Nature qualifies as an RTC under the Plan.

("Outdoor Youth Programs"); Utah Admin. Code r. 501-19 *et seq.* ("Residential Treatment Programs"). As a court in the Southern District of Florida has explained:

> Utah holds organizations licensed as residential treatment programs to more stringent requirements than organizations licensed as outdoor youth programs. For example, residential treatment programs are required to have on staff licensed physicians, psychologists, *and* mental health therapists, all of who have had specific training in mental health, substance abuse, and children and youth. Utah Admin. Code R501-19-5. Outdoor youth programs, on the other hand, need only employ a licensed . . . physician and one "treatment professional," who need not have specific training in mental health or substance abuse. Utah Admin. Code R501-86.

*H.H. v. Aetna Ins. Co.*, 342 F. Supp. 3d 1311, 1318 (S.D. Fla. 2018).

Of course, Second Nature's licensure as an Outdoor Youth Program as opposed to a Residential Treatment Program is not dispositive under the Plan, as the Plan requires merely that Second Nature be licensed "by the appropriate state and local authority to provide" RTC services. Pl.'s SOF ¶ 30. But, as Defendant points out, an Outdoor Youth Program license does not meet the requirements for consideration as an RTC under the Plan. For instance, nothing about an Outdoor Youth Program in Utah suggests that it occurs in a "controlled environment," *see id.*; rather, the regulations describe a variety of "field operations" and "expedition plan[s]," including hiking and camping. *See* Utah Admin. Code r. 501-8. The licensing requirements even allow for "solo component[s] for [minors] as part of the program." *Id.* r. 501-8-21(1). Furthermore, the regulations recognize the "inherent dangers of the wilderness," suggesting that neither a "controlled environment" nor a "degree of security" are contemplated. *Id.* r. 501-8-23(1); *see* Pl.'s SOF ¶ 30. What is more, nothing in the regulations require Outdoor Youth Programs to provide "24 hour onsite

nursing services," *see* Pl.'s SOF ¶ 30. Instead, they merely require first-aid treatment to be prompt; ill or injured minors to be seen by a licensed professional; and each minor's physical condition to be assessed every 14 days. *Id.* r. 501-8-6; r. 501-8-12.

Still, Plaintiff argues, Second Nature goes above and beyond the requirements of Outdoor Youth Programs and meets the Plan's definition of an RTC because it "provides clinical intervention with weekly individual and group therapy, coordinated by a licensed psychologist, and implemented by trained residential staff," including "24/7 medical/support staff." Pl.'s Mem. Supp. at 8. But even if this is true, Second Nature does not have a license to provide RTC services. Instead, it has a license to perform different, noncovered services. Accordingly, regardless of whether Second Nature is a "wilderness program" and not an RTC, or whether it offers RTC-type services without a license, it is ineligible for coverage under the terms of the Plan.

## B.    Mental Health Parity

To the extent Second Nature is considered a wilderness program as opposed to an unlicensed RTC, Plaintiff argues that the exclusion of coverage for wilderness programs violates the Parity Act. The Parity Act requires group health plans to provide the same aggregate benefits for mental healthcare as they do for medical and surgical benefits.[5] *Natalie V. v. Health Care Serv. Corp.*, No. 15 C 09174, 2016 WL 4765709, at *2–3 (N.D. Ill. Sept. 13, 2016). In particular, the Parity Act requires parity among quantitative and nonquantitative "treatment limitations" placed on

---

[5]    Illinois's parity law is interpreted as consistent with the Mental Health Parity and Addiction Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified at 29 U.S.C. § 1185a). *See* 215 Ill. Comp. Stat. 5/370c.1(e).

mental health and medical or surgical benefits. *Id.* Treatment limitations subject to the Act "includ[e] limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." 29 U.S.C. § 1185a(a)(3)(B)(iii).

Regulations promulgated by the Departments of Labor, Health and Human Services, and Treasury clarify that treatment limitations should be scrutinized with respect to certain classifications of treatment: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. *Natalie V.*, 2016 WL 4765709, at *4–6; *see* 29 C.F.R. § 2590.712(c)(2)(ii). If a plan provides medical benefits within a certain classification, it cannot impose more stringent limitations on a mental health benefit within the same classification. *Natalie V.*, 2016 WL 4765709, at *4–6. Plans need not apply the *same* limitations to all benefits; rather, "the processes, strategies, evidentiary standards, and other factors plans use[ ] to impose those limitations [have] to be *comparable* for all benefits." *Id.* (citing 29 C.F.R. § 2590.712(c)(4)(i)).

The regulations confirm that "skilled nursing facilities" are the medical equivalent to residential mental health treatment centers. *Natalie V.*, 2016 WL 4765709, at *6. In this case, the Plan defines a "Skilled Nursing Facility" ("SNF") as an "institution or a distinct part of an institution which is primarily engaged in providing comprehensive skilled services and rehabilitative Inpatient care and is duly license[d] by the appropriate governmental authority to provide such services." Pl.'s SOF ¶ 30. It makes no mention of "wilderness programs." *Id.* Plaintiff contends

that the Plan's exclusion of wilderness programs from the definition of RTCs, but not from the definition of SNFs, amounts to a more stringent geographic limitation on residential mental healthcare as opposed to inpatient medical care. And as recognized in *Natalie V.*, "plan or coverage restrictions based on geographic location . . . must comply with the [nonquantitative treatment limitation] parity standard." 2016 WL 4765709, at *6.

A developing body of case law has begun to examine the exclusion of "wilderness programs" or "wilderness therapy" from mental healthcare benefits as a potential violation of the Parity Act. *See, e.g.*, *Michael D. v. Anthem Health Plans of Ky.*, No. 2:17-cv-675, 2019 WL 586673 (D. Utah Feb. 13, 2019); *A.G. v. Cmty. Ins. Co.*, No. 1:18-cv-300, 2019 WL 340471 (S.D. Ohio Jan. 28, 2019); *H.H.*, 342 F. Supp. 3d 1311; *Roy C. v. Aetna Life Ins. Co.*, No. 2:17cv1216, 2018 WL 4511972 (D. Utah Sept. 20, 2018); *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248 (S.D.N.Y. 2018); *A.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069 (W.D. Wash. 2018); *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, No. 17-cv-10844-DJC, 2018 WL 3518511 (D. Mass. July 20, 2018); *A.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387 (W.D. Wash. June 5, 2018); *Michael P. v. Aetna Life Ins. Co.*, No. 2:16-cv-00439-DS, 2017 WL 4011153 (D. Utah Sept. 11, 2017); *Welp*, 2017 WL 3263138. A significant limitation in relying on this case law, however, is the varying language used in the respective plans. Because each contract must be interpreted according to its own terms, the results of these cases are, predictably, all over the map.

As to this Plan, the Court concludes that there is no Parity Act problem. Contrary to Plaintiff's argument, wilderness programs do not include programs that *could* be considered RTCs but for their location. Instead, as explained earlier, RTCs are defined as one type of program, offering therapeutic intervention in a controlled environment, medical monitoring, and 24-hour onsite nursing. By contrast, wilderness programs offer a different service providing merely a supportive environment and methods to address social needs. Accordingly, there is no geographic limitation on RTCs that is not present in the Plan's coverage of SNFs. Rather, as previously explained, "[t]he citation to wilderness programs here serve[s] as a mere illustration of a treatment that does not meet" the definition of an RTC under the Plan. *Welp*, 2017 WL 3263138, at *5; *see also A.G.*, 2019 WL 340471, at *6–7 (concluding that the plaintiff had failed to plead a Parity Act violation because the plan equally covered RTCs and SNFs, but did not cover "wilderness programs").

Of course, defining RTCs to exclude the types of services offered by wilderness programs could still violate the Parity Act if similar services were not also excluded from medical care under the Plan. But here, the Plan makes clear that it does not cover admission to SNFs "for the primary purposes of providing Custodial Care Service, convalescent care, rest cures or domiciliary care"; nor does the Plan cover "[t]he use of skilled or private duty nurses to assist in daily living activities, routine supportive care or to provide services for the convenience of the patient and/or his family members." Pl.'s SOF ¶ 30. Accordingly, under the Plan, neither SNFs nor RTCs cover services that are primarily supportive in nature as opposed to necessary

to treat a medical or mental health issue. The Court concludes that these definitions are in parity. *See also A.G.*, 2019 WL 340471, at *6–7; *Michael P.*, 2017 WL 4011153, at *7 (noting that some differences between mental healthcare and medical care can be tolerated under the Parity Act where "the difference in requirements is not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment at [different] facilities").

The Plan in this case is distinguishable from those in cases that have found Parity Act violations. For instance, in many of the cases finding wilderness program exclusions problematic, there was either no definition of "wilderness program" or a broader definition than the one in this case. Accordingly, in those cases, the exclusion of wilderness programs appeared to be mere geographic limitations on otherwise covered RTC care. *See, e.g., Gallagher*, 339 F. Supp. 3d 248 (concluding that the Parity Act was implicated by a plan administrator's choice to deny coverage for a "residential treatment center offering wilderness therapy"); *A.Z.*, 333 F. Supp. 3d 1069 (concluding that a wilderness program exclusion could violate the Parity Act where the plan appeared to categorically exclude medically necessary services at such programs); *Vorpahl*, 2018 WL 3518511 (concluding that the exclusion of wilderness therapy could violate the Parity Act because it represented an exclusion of a type of RTC).

Parity concerns may also arise by a plan's practice of covering services differently even though they appear to be treated equally under the plan—an issue not present in this case. *See, e.g., A.Z.*, 333 F. Supp. 3d 1069 (concluding that plaintiff

had pleaded a Parity Act violation by alleging that the plan had a "practice of excluding wilderness therapy . . . even when exclusion is not permitted by the plan"). Here, as already described, the Plan simply defines RTCs in a way that does not cover mere supportive services, a limitation that is generally equal to similar limitations on SNFs under the Plan.

The Court concludes that Second Nature does not meet the requirements for coverage under the Plan as an RTC, and further concludes that the Plan's definition of RTCs does not violate the Parity Act. Accordingly, the Court finds in favor of Defendant with respect to its denial of coverage for Plaintiff's treatment at Second Nature.

### Coverage for Treatment at Vista Residential Treatment Center

Defendant also denied coverage for the portion of Plaintiff's stay at Vista from September 1, 2015, to May 15, 2016, concluding that treatment was not "medically necessary" under the Plan. It is Plaintiff's burden to set forth facts establishing that her treatment was, in fact, "medically necessary" during that period. *See Ruttenberg*, 413 F.3d at 663; *Halley*, 141 F. Supp. 3d at 865.

## I. Findings of Fact

### A. Covered Period (May 26, 2015 to August 31, 2015)

On May 26, 2015, the same day Plaintiff was discharged from Second Nature, she was admitted to Vista. Pl.'s SOF ¶ 22. Plaintiff's diagnoses upon her admission included ADHD, PTSD, cannabis use disorder, major depressive disorder, oppositional defiant disorder, and borderline personality disorder traits. *Id.* ¶ 23.

While at Vista, Plaintiff received individual, family, and group therapy on an intensive basis. *Id.* ¶ 24. She was also prescribed Pristiq for anxiety and depression, and Vyvanse for ADHD. *Id.*

After Plaintiff was admitted to Vista, Defendant undertook regular reviews of the "medical necessity" of her treatment there. Under the Plan, Defendant covers only hospitalization or healthcare services that are "medically necessary." *Id.* ¶ 29. The Plan states that "Medically Necessary" means "a specific medical, health care, supply or Hospital service is required, for the treatment or management of a medical symptom or condition and that the service, supply or care provided is the most efficient and economical service which can safely be provided." *Id.* ¶ 30. The fact that a physician prescribes, orders, recommends, approves, or views certain services as necessary does not mean that they will be considered "medically necessary" under the Plan. Def.'s SOF ¶ 8.

In making the medical necessity determination, Defendant may apply the Milliman Care Guidelines (among other guidelines and policies). *Id.* ¶ 10. The Milliman Care Guidelines provide that residential care is no longer needed if (1) the patient has not made a suicide attempt or act of serious self-harm, and has no suicidal or homicidal thoughts; (2) the patient understands follow-up treatment and can participate in monitoring; (3) the provider and "supports" are available at a lower level of care; (4) no essential function is impaired or cannot be managed at a lower level of care; and (5) the patient's medical needs are absent or manageable at a lower level of care. *Id.* ¶¶ 11–12.

Defendant first determined that Plaintiff's treatment at Vista was medically necessary on June 1, 2015, and approved benefits at that time for May 26 to June 9. Def.'s SOF ¶ 21. Defendant went on to determine that Plaintiff's treatment was medically necessary for short periods again on June 9, June 15, June 25, July 6, July 8, and July 22. *Id.* ¶¶ 22–24, 26–27, 30. Reviews typically noted that Plaintiff met the Milliman Care Guidelines based on a variant of the following factors: (1) treatment at the "highest non-residential level of care has failed and/or is not feasible without acute intervention or modification"; (2) Plaintiff had a history of self-harm; (3) Plaintiff manifested poor impulse control, lying, stealing from peers, and stealing from stores; and (4) Plaintiff had manifested a decrease in functioning, poor school and home functioning, stealing from peers, and a need for additional "family work." R. 2006, 2007–20.

On the last of these occasions—July 22, 2015—the initial reviewer, Heather Toby, concluded that Plaintiff did not meet the Milliman Care Guidelines for continued care at Vista. Def.'s SOF ¶ 30. Toby "escalated" the review to a physician, Dr. Webster, who determined that treatment was medically necessary for another seven days. *Id.* Dr. Webster stated that, although Plaintiff had "made some progress since admission," she still had "behaviours [*sic*] that would make it difficult for her to function in a longer term placement such as a therapeutic boarding school." R. 2013.

Plaintiff's treatment was again found medically necessary on July 29, August 6, August 12, and August 19. Def.'s SOF ¶¶ 31, 33–34, 36.

## B. Finding of No Medical Necessity

On August 31, 2015, Toby again concluded that treatment at Vista was no longer medically necessary. Def.'s SOF ¶ 38. She determined that Plaintiff no longer met the Milliman Care Guidelines because (1) Plaintiff denied suicidal ideation, homicidal ideation, and psychosis, and (2) she had "improving insight, judgment and impulse control," as well as an "increase in overall functioning and . . . a more stable mood." R. 2005.

On September 1, Dr. Rasik Lal concurred with Toby's findings. Def.'s SOF ¶ 39. Dr. Lal noted that Plaintiff recently had a positive visit with her parents, had not stolen anything, had no "major incidents," and was listening to staff and following directions. *Id.* ¶ 41. He further noted that Plaintiff denied suicidal ideation, homicidal ideation, and psychosis, and that her mood was "stable" and "pleasant." *Id.* Dr. Lal stated that Plaintiff's judgment, insight, and impulse control were improving, and that Plaintiff's parents were "supportive." *Id.* Dr. Lal omitted, however, the opinion of Vista counselor Toni Mazzaglia that "[Plaintiff] would be at high risk if she were to return home." Pl.'s SOF ¶ 47.[6]

Defendant then concluded that treatment at Vista was no longer medically necessary as of September 1, 2015, and communicated that finding to Plaintiff in a letter the same day. Def.'s SOF ¶ 42. The letter explained:

---

[6] Defendant objects to the document containing Mazzaglia's recommendation because it is outside the administrative record. The Court overrules this objection, because the Court finds that the opinion of a treating provider from the time of the denial of benefits is highly relevant and necessary to the Court's judgment in this case. *See Estate of Blanco*, 606 F.3d at 402.

There was no report of psychosis or mania. You were not reported as being a[ ] danger to self or others. There was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas. You were not reported as being aggressive or threatening. There was no report of medical instability. No new issues were reported. You have achieved maximum benefit from the requested level of care. There is no reasonable expectation of significant clinical improvement with the current treatment plan or level of care. . . .

*Id.* ¶ 43.

Plaintiff pursued administrative appeals of Defendant's decision. Pl.'s SOF ¶¶ 37, 50, 60. And on May 3, 2016, Defendant sought the opinion of Dr. Timothy Stock, the Medical Director for Blue Cross Blue Shield of Texas. *Id.* ¶¶ 56–57. Dr. Stock agreed with Dr. Lal's determination that Plaintiff's treatment at Vista was no longer medically necessary as of September 1, 2015. *Id.* On May 4, 2016, Defendant sent a letter to Plaintiff explaining its conclusion that she did not meet the Milliman Care Guidelines:

On the dates in question you were not an acute danger to yourself. You were not an acute danger to others. You were not behaviorally dyscontrolled. You were tolerating medication. You were medically stable. You were not reported to be psychotic. You had adequate self-care. You were participating and cooperative with treatment. You had a supportive family home environment. From the clinical evidence presented, you could have been safely treated at the MENTAL HEALTH OUTPATIENT level of care.

*Id.* ¶ 58. Plaintiff appealed the determination again, but Defendant upheld its determination. *Id.* ¶ 59.

### C.   Non-Covered Period (September 1, 2015 to May 16, 2015)

Plaintiff remained at Vista for eight more months after Defendant's finding that her stay there was not medically necessary. Pl.'s SOF ¶ 25. The parties dispute

whether or not the evidence during this period shows that Plaintiff continued to meet the Milliman Care Guidelines for residential care. Defendant focuses on evidence showing Plaintiff's relative improvement, and on statements made in certain clinical notes that she presented "no identifiable risk." *See* Def.'s SOF ¶¶ 45–50. Plaintiff, by contrast, points to statements made in other clinical notes that she presented a "high risk outside of [a] controlled environment." Pl.'s SOF ¶¶ 52–53. She further points to evidence that her improvement was limited and that her behavioral problems recurred throughout her time at Vista. *See id.* at SOF ¶¶ 51–55.

As an initial matter, the Court finds the parties' focus on the "risk assessments" in the clinical notes almost entirely unhelpful. Contrary to Defendant's assertion that the "vast majority of Plaintiff's risk assessment status reports indicate[d] Plaintiff had 'no identifiable risk,'" the Court finds a roughly equal amount of "no identifiable risk" findings compared to "high risk" findings.[7] Both risk assessments made the day Plaintiff's coverage ended were for "high risk." R. 6905, 6907. Furthermore, throughout her stay, Plaintiff would be described variously as "no risk" or "high risk" within a matter of days; in fact, on November 24, 2015, counselors made opposite findings on *the same day*. R. 6761, 6756. Moreover, the counselors' risk assessments seemingly bear little relation to what was discussed during the sessions. Frequently, counselors reported that Plaintiff presented "no

---

[7]     *Compare* R. 1233, 1245, 1346, 6619–20, 6648, 6660, 6664, 6667, 6672, 6675–76, 6688–89, 6695, 6697, 6699, 6701, 6705, 6716, 6718, 6741–42, 6757, 6761, 6765–66, 6787, 6796, 6825, 6829 (no identifiable risk) *with* R. 1572, 6627, 6631, 6633, 6637, 6640, 6642, 6646, 6713, 6756, 6776–77, 6779, 6791, 6799, 6802, 6810, 6815–16, 6835, 6840, 6850, 6856, 6859, 6869–70, 6877, 6879, 6900, 6905, 6907 (high risk outside of controlled environment).

risk" but stated that her behavior and emotions were still struggling.[8]  But just as frequently, a "high risk" finding corresponded with notes of progress.[9]  Accordingly, the Court accords little weight to the "risk assessments."

Defendant points to other evidence purporting to show Plaintiff's improvement while at Vista, but misstates the significance of some of these facts.  For instance, Defendant points to a "weekly academic update" that begins: "Girls Team: No Red Flags, woohoo!"  R. 6898.  Defendant suggests that this means Plaintiff was exhibiting no "red flag" behaviors.  But a review of other similar academic updates shows that each one begins with a listing of *any* girl on the "girls team" who was considered to be on "red flag" status in a particular academic subject.  *See, e.g.*, R. 6688.  Defendant does not clarify why the mere fact that Plaintiff was not flagged in an academic subject means that she was no longer suffering from problems requiring residential care.  In fact, the same academic update Defendant points to explains that Plaintiff had "low test scores," was not doing "very well getting her work in," and had turned in an assignment "to avoid the red flag list."  R. 6898.  Her school work fluctuated after that point, and on October 19, she was put on the "red flag" list for math, with her teacher noting that she needed support in prioritizing.  R. 6822; *see* R. 6772.

---

[8]     *See, e.g.*, R. 6619 (2/8/16, avoidant and had little insight into behavior), 6620 (2/8/16, in a "cycle of self-sabotage" and struggling to redirect), 6648 (1/20/16, avoidant on a "subconscious level"), 6660 (1/15/16, same), 6664 (1/14/16, highly avoidant and manipulative), 6688 (12/30/15, "re-engaging in red flag behaviors"), 6689 (12/30/15, engaging in concerning behaviors), 6695 (12/23/15, defensive and struggling), 6697 (12/22/15, having old thought processes and patterns coming up).

[9]     *See, e.g.*, R. 6779 (11/9/15, gaining confidence), 6791 (11/3/15, calm and present, more consistent behavior), 6859 (9/28/15, "tremendous" progress), 6870 (9/25/15, calm and realistic, understood consequences), 6905 (9/1/15, positive and had a great time with parents).

Plaintiff points to further evidence that she continued to struggle past September 1 with the issues for which she entered Vista. For instance, on September 16, Plaintiff's counselor noted that she had recently lied to peers and was not able to be honest about it until confronted; furthermore, although she was "creating new habits and patterns," the "old ones [were] still present." R. 6881. Counselors continued to note Plaintiff's lying, manipulating, impulse control issues, and "sneaky behaviors" throughout her time at Vista. *See* R. 6630, 6633, 6664, 6688–89, 6695, 6697, 6777, 6816, 6822, 6840, 6859, 6877. Additionally, although her depression and anxiety improved somewhat, in October she reported that her depression was still at a 5 out of 10, and her psychiatrist accordingly increased her depression medication. R. 6830. Plaintiff also continued struggling to be open and vulnerable about her experiences; in particular, she used her later time at Vista to work through the difficult process of opening up about sexual trauma. *See* R. 6667, 6672, 6765, 6777, 6815, 6829. Plaintiff also continued to "self-sabotage" throughout her time at Vista. *See* R. 6620–21, 6627.

Although there is evidence of some improvement and good days, *see* R. 1233, 1245, 1346, 6675, 6709–10, 6716, 6724, 6741, 6753, 6793, 6819, 6872, 6893, the Court finds that this evidence is significantly outweighed by the evidence of Plaintiff's substantial ongoing issues. First, these good days and moments of improvement were often treated by Plaintiff and her counselors as being temporary. *See, e.g.*, R. 1245 ("[Plaintiff] discussed her recent positive trend."); 6675 ("[Plaintiff] stated she feels she is in an upswing with her mood, and honesty with herself."). Second, the mere

incidence of some improvement does not mean treatment was no longer medically necessary. For instance, just because Plaintiff reported having a positive time with her parents on September 1, *see* R. 6905, does not mean that her parent-child issues no longer necessitated the same level of care. Rather, she continued to have difficulty interacting with her parents. *See* R. 6810, 6859. Similarly, just because Plaintiff had not lied or stolen immediately prior to September 1 does not mean that her impulse control issues were drastically improved; she went on to experience later cycles of the same behavior. *See* R. 6633, 6689, 6822, 6877, 6881, 6900.

Significantly, many of the behaviors and problems Plaintiff continued to experience after September 1 are the same as those that caused Defendant initially to declare her treatment at Vista medically necessary. For example, Defendant stated that Vista treatment was necessary because of Plaintiff's manifestation of poor impulse control, lying, and stealing; as already described, Plaintiff continued to experience these issues after September 1. *See* R. 6630, 6633, 6664, 6688–89, 6695, 6697, 6777, 6816, 6822, 6740, 6859, 6877, 6881, 6900. Similarly, Defendant considered Plaintiff's treatment necessary because of her poor school and home functioning and need for additional "family work"; these needs did not cease to exist on September 1 either. *See* R. 6772, 6810, 6822, 6859. And Defendant further stated that treatment at Vista was necessary because treatment at the highest level of non-residential care had previously failed and Plaintiff had a history of self-harm; this continued to be true. Accordingly, several of Defendant's reasons for denying further coverage—that she had improved insight, judgment, and impulse control; that she

had a positive visit with her parents; and so forth—do not present a complete picture of Plaintiff's status after September 1.

More troubling is the fact that many of the reasons Defendant gave for eventually finding Plaintiff's treatment not medically necessary are essentially unrelated to Plaintiff's treatment needs. Defendant, in denying coverage, noted that Plaintiff denied suicidal ideation, homicidal ideation, and psychosis, *see* R. 2005, but none of these was noted as an issue necessitating treatment to begin with. Similarly, although Plaintiff was reported to be listening to staff and following directions and to have a "stable mood," Def.'s SOF ¶ 41, it is not clear why those facts would mean that Plaintiff's depression, anxiety, oppositional defiant disorder, or ADHD were significantly improved. Along these same lines, the fact that Plaintiff was not "aggressive or threatening," had not been reported medically unstable, and was not an "acute danger to others" are entirely unresponsive to Plaintiff's original reasons for seeking treatment. *See* Def.'s SOF ¶ 58.

The Court is cognizant of the fact that it is not reviewing the decisions made by Defendant's claims administrators *per se*. Still, Defendant's own evaluation of Plaintiff's medical needs under the Milliman Care Guidelines when she arrived at Vista deserves a great deal of weight with regard to the extent of her *later* medical needs under those same guidelines. Plaintiff has shown that the same factors that caused her to need Vista treatment initially continued beyond September 1, 2015. Although she may have had a good day on August 31 or September 1, and although she had other good days and good clinical sessions later, this does not prove that her

conditions improved to such a degree that she could be effectively treated at a lower level of care. What is more, it cannot be ignored that whatever improvement Plaintiff was able to achieve, she did so by participating in intensive, round-the-clock therapy and residential care; accordingly, it sheds little light on how she would respond to outpatient care, particularly given her limited improvement and the recurrence of negative behaviors and emotions.

The weight of the evidence shows that, by the time she was discharged from Vista, Plaintiff had made some strides in terms of recognizing and communicating about her issues, but continued to experience struggles with depression and inappropriate behaviors, and required ongoing structure and support. R. 2194–96. Plaintiff's progress in therapy shows that she had begun learning coping and communication skills, but not that her psychological or educational needs were significantly reduced. Accordingly, the Court finds that Plaintiff has met her burden to prove that her needs could not have been managed at a lower level of care, and that she met the Milliman Care Guidelines for residential care from September 1, 2015, to May 15, 2016.[10] *See* Def.'s SOF ¶¶ 11–12. Thus, Plaintiff's treatment during that time was "medically necessary" under the Plan. *See id.* ¶¶ 7–12.[11]

---

[10]     Plaintiff disputes the propriety of relying on the Milliman Care Guidelines in this case, arguing that they are too stringent. Because the Court concludes that Plaintiff prevails even under those guidelines, the Court does not address this argument.

[11]     Because the Court concludes that Plaintiff has shown the medical necessity of her treatment based solely on the evidence from September 2015 to May 2016, the Court does not consider Plaintiff's post-Vista treatment records.

## II. Conclusions of Law

Because the Court holds that Plaintiff's treatment at Vista was "medically necessary" under the Plan, the Court concludes that Plaintiff is entitled to recover unpaid benefits for the period from September 1, 2015, to May 15, 2016, under 29 U.S.C. § 1132(a)(1)(B).

## III. Remedy

Plaintiff seeks (1) backpay for unpaid benefits for her treatment at Vista, (2) prejudgment interest, and (3) attorneys' fees.

"[P]rejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). This presumption is "specifically applicable to ERISA cases." *Rivera v. Benefit Tr. Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991). Whether to award prejudgment interest is a "question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*, 207 F.3d 876, 885 (7th Cir. 2000). Here, the award is appropriate to make Plaintiff whole after she spent a significant amount of money on care that should have been covered. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). Because there is no statutory interest rate under ERISA, prejudgment interest will be awarded at the current prime rate of 5.50%. *See id.*

As to back payments, the Court cannot determine the appropriate amount on this record. Plaintiff asserts that she paid approximately $90,880.00 out of pocket for

her care at Vista from September 1, 2015, to May 15, 2016. Pl.'s SOF ¶ 64. Defendant states that, if it had fully covered her stay at Vista, it would have paid $37,434.50, after cost-sharing and other deductions. *See* Def.'s Ex. A, Damon Decl. ¶ 12. But this amount appears to exclude the period from May 1, 2016, to May 15, 2016, as Defendant asserts that Plaintiff did not file a claim for coverage for that time period. *See id.* ¶¶ 11–12. Yet Defendant previously admitted that Plaintiff *did* submit a timely claim for coverage for her entire stay at Vista. *See* Def.'s Resp. Pl.'s SOF ¶ 37; Def.'s Answer ¶ 31, ECF No. 24.[12] Because Defendant's own representations are conflicting as to this issue and it has submitted no documentary evidence either way, the Court cannot resolve the amount of backpay to which Plaintiff is entitled.

The Court further determines that an award of attorneys' fees is inappropriate. The Court must first consider whether Plaintiff is eligible for a fee award, in other words, whether she has shown "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010). This standard is obviously met, as the Court has concluded that Defendants wrongly withheld benefits for a period of eight and a half months of residential treatment. But the inquiry does not stop there.

The Court also must decide whether the non-prevailing party's position was substantially justified and taken in good faith, or whether it was intended to harass Plaintiff. *See Herman v. Cent. States, Se. & Sw. Areas Pens. Fund*, 423 F.3d 684, 696

---

[12]     Defendant further states that it has already paid Plaintiff $4,629.69 to cover part of the unpaid portion of her stay at Vista. Def.'s Ex. A, Damon Decl. ¶ 10.

(7th Cir. 2005). Here, the Court finds that Defendant's position, although non-meritorious, was substantially justified. The question of Plaintiff's eligibility for residential care was primarily a factual one, and there were some facts, including physicians' opinions, pointing in Defendant's favor. There is no evidence that Defendant intended to harass Plaintiff or that it denied benefits in bad faith.

**Conclusion**

For the reasons provided, the Court grants in part and denies in part the parties' Rule 52 motions. The Court finds in favor of Defendant as to Plaintiff's claim for coverage of her stay at Second Nature. The Court further finds in favor of Plaintiff as to her claim for coverage of her stay at Vista Residential Treatment Center from September 1, 2015, to May 15, 2016. The Court directs the parties to meet and confer regarding the amount of back payments owed for this period and the amount of prejudgment interest. The parties should file a status report by April 1, 2019 reflecting their agreement as to these amounts. If the parties cannot agree, Plaintiff may file a motion, accompanied by a brief of no more than 7 pages, by April 8, 2019, seeking to have the Court determine the amounts. Defendant's response to the motion will be due by April 22, 2019, and will be limited to 7 pages as well. A status hearing is set for 5/1/19 at 9:00 a.m.

**IT IS SO ORDERED.**                    **ENTERED    3/18/19**

_____
**John Z. Lee**
**United States District Judge**